2020 IL App (1st) 180486-U

No. 1-18-0486

Order filed June 22, 2020

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 DV 74307 |
| | ) | |
| JOSE RAMIREZ, | ) | Honorable |
| | ) | Diana L. Kenworthy, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE GRIFFIN delivered the judgment of the court.
Justices Hyman and Pierce concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Defendant's conviction for theft is affirmed over his challenge to the sufficiency of the evidence of intent.

¶ 2    Following a bench trial, defendant Jose Ramirez was convicted of theft and sentenced to six months of supervision and three days in the Sheriff's Work Alternative Program (SWAP). On appeal, defendant contends the State failed to prove him guilty beyond a reasonable doubt where

the evidence did not show he intended to permanently deprive his estranged wife of her cellular telephone (cell phone) when he took it from her. We affirm.

¶ 3    Defendant was charged with one count of theft (720 ILCS 5/16-1(a)(1)(A) (West 2016)), which alleged that he knowingly exerted unauthorized control over Nohemi Muniee's cell phone, valued at under $500, with the intent to deprive her permanently of the use of that cell phone.[1]

¶ 4    Nohemi Muniee testified that she was formerly married to defendant, whom she identified in court, and had three children with him.

¶ 5    At approximately 3:30 p.m. on June 12, 2017, Muniee was with her 10-year-old and 8-year-old sons on North St. Louis Avenue in Chicago after picking them up from school. Muniee and her sons were walking down the street when she saw defendant exiting a vehicle. Defendant started an argument with Muniee, and Muniee told him to leave and that she had an order of protection against him. Muniee took her cell phone out of her purse to call the police. Defendant grabbed her cell phone out of her hand, pushed her, ran to his vehicle, and drove away.

¶ 6    Muniee borrowed a cell phone to call the police, who arrived approximately 15 minutes later. After Muniee spoke to them, she dropped her children off at home, went to a Metro PCS cell phone store to report that her phone had been stolen and to get a new phone, and then drove toward a police station.

¶ 7    At approximately 6:30 p.m., while driving to the police station, Muniee passed the house on West Deming Place where defendant lived with his sister, and saw the vehicle defendant had been driving earlier parked at the house. Muniee called the police, and Officer Gomez arrived and

_____

[1] Nohemi's last name is spelled "Munive" in the criminal complaint against defendant, and defendant uses that spelling in his briefs. However, according to the trial transcript, she testified that her last name is spelled "Muniee," so that is the spelling we use here.

spoke to her. Gomez knocked on defendant's sister's house and spoke to his sister, and then returned Muniee's cell phone to her.

¶ 8    On cross-examination, Muniee testified she was married to defendant for four to five years; she also testified that they were married in 2004. She separated from defendant two years before the 2017 trial and, the year before trial, sought an order of protection against him. Defendant had not been served with that order of protection, however. In the year prior to trial, defendant sometimes called Muniee and, prior to the order of protection being issued, defendant saw his children "about twice."

¶ 9    On June 12, 2017, Muniee tried to call 911, but defendant began to "struggle" with her, trying to take her cell phone. Defendant pushed Muniee in the arm with both of his hands, hard enough that she "fell away," and he pulled the phone from her hands. Defendant then ran away with her cell phone. Muniee did not want defendant to take her cell phone. Defendant's vehicle was approximately three vehicles away from where the struggle occurred.

¶ 10    Muniee spoke to two female police officers on June 12, 2017. She told the police that defendant had been recording her and the children with his cell phone.

¶ 11    Chicago police officer Robert Gomez testified that he was on duty on June 12, 2017, and was dispatched to an address on West Deming Place. Gomez was in uniform, working with a partner, and driving a police vehicle. He arrived at West Deming Place in the afternoon and met Muniee down the block from defendant's house. Gomez spoke to Muniee and then went to retrieve her cell phone from defendant's house.

¶ 12    Gomez went to defendant's house and rang the doorbell. A woman, who was either defendant's mother or his sister, came to a gate at the front of the house, and Gomez asked to speak

to defendant by name. Defendant did not come out to speak to Gomez, and the woman told Gomez that defendant was not home. Gomez told the woman defendant must be at home because his vehicle was parked in front of the house, and asked her four or five times to give him Muniee's cell phone so he could give it back to her. The woman initially refused, and Gomez "went back and forth" with her as she said, "[N]o, no, no." She "[f]inally" went inside for fewer than 40 seconds, returned with Muniee's cell phone, and gave it to Gomez. Gomez could not see the woman when she was inside the house. Gomez went down the block and gave Muniee the cell phone, and she confirmed that it was her cell phone. Gomez had matched defendant's name to a photograph, but did not arrest defendant at that time because the woman he spoke to would not allow him inside her house.

¶ 13 On the afternoon of June 19, 2017, Gomez was on duty, in uniform, working with a partner, and driving a police vehicle. Gomez saw defendant, whom he idenfitied in court, near defendant's house. Gomez called defendant by his name, confirmed his identity, and arrested him for theft.

¶ 14 On cross-examination, Gomez testified that he did not see defendant on June 12, 2017. Muniee was not in front of the house on Deming when Gomez spoke to the woman who gave him Muniee's cell phone. He did not see any marks or bruises on Muniee's body, and Muniee did not call his attention to any marks on her body.

¶ 15 The State rested, and defendant made a motion for a directed finding, which was denied.

¶ 16 Defendant testified that he was married to Muniee for 13 years and had four children with her. At the time of trial, he was aware that Muniee had an order of protection against him. In June 2017, defendant occasionally saw and spoke to Muniee at their children's school, and he saw his children periodically as well.

¶ 17    Since November 2016, defendant had lived with his sister Victoria in a house on West Deming Place.

¶ 18     At approximately 3:26 p.m. on June 12, 2017, defendant drove his sister's Honda pickup truck to the school that two of his and Muniee's sons attended, which was on St. Louis Avenue. He went to the school to see his children, but had not discussed doing so with Muinee beforehand. Defendant talked to Muniee and their two sons for 20 to 25 minutes in front of his sister's truck. The truck's windows were down during this conversation because it was summer. Defendant asked Muniee to give him documents relating to the order of protection against him. Muniee smiled and told him to wait for the police to arrive and give the documents to him. Defendant did not get into an argument with Muniee, did not see her cell phone, did not take her cell phone, and did not push her.

¶ 19    Defendant got into his sister's truck and drove to her house. Muniee was near the back of the truck when defendant drove away, but defendant never saw her inside the truck. When defendant arrived at his sister's house, he saw Muniee's cell phone in the back of the truck. Defendant gave the cell phone to his sister Victoria because he was going to work, and gave her instructions about what to do with it. Defendant then went to work. He was arrested the following week.

¶ 20    On cross-examination, defendant testified that, on the afternoon of June 12, 2017, Muniee did not use her cell phone to call the police while she and defendant were near their sons' school because there "was never any incident or the desire to call the police." Defendant denied that Muniee did not want him talking to their children. He also denied that Muniee walked away from

him with their children, that he tried to stop her from walking away, that he was frustrated, that he pushed her arm, and that he grabbed her cell phone out of her hand.

¶ 21    Defendant was alone in the truck when he drove to his sister's house. When defendant first saw Muniee's cell phone, it was in the rear passenger-side seat of the truck. He also saw t-shirts in the rear seat of the truck, which he brought into the house. When defendant saw Muniee's cell phone, he did not call Muniee or try to return it to her. Defendant knew where Muniee lived, but did not go to her residence. Defendant was served with the order of protection after he was arrested on June 19, 2017.

¶ 22    Defendant worked delivering food throughout Chicago and used his sister's truck to make deliveries. He initially testified that he was not working on June 12, 2017, and that he only called his boss from his sister's house to report that he was ready to work. However, defendant then testified that he went to work on June 12, 2017.

¶ 23    On redirect examination, defendant testified that he gave Muniee's phone to his sister and directed her to return it to Muniee.

¶ 24    Victoria Lopez testified that defendant is her brother. Since July 2016, defendant had lived at her house on West Deming Place.

¶ 25    On June 12, 2017, defendant came home and saw Lopez in the living room. He handed her a black cell phone and instructed her to give the phone to Muniee, saying that Muniee had left the cell phone in the truck and that he did not want any problems with her. He said, "I know she's coming, she's coming to pick up the phone." Defendant then left to go to work.

¶ 26    After defendant left, Lopez waited for someone to pick up the phone for approximately an hour. A police officer knocked on the door and asked if defendant lived there; Lopez confirmed

that he did. The police officer asked Lopez to call defendant, and Lopez told the officer that defendant had just left. The officer told Lopez that defendant took a cell phone from Muniee. Lopez telephoned defendant and told him that the police were asking for the cell phone. The police officer was standing in front of Lopez when she called defendant, and Muinee's cell phone was to her side. Lopez gave the cell phone to the police officer.

¶ 27    On cross-examination, Lopez testified that she did not let the police officer she spoke to on June 12, 2017, enter her house because he never asked to come in. The officer asked her where the cell phone was, and Lopez responded, "I have it." Lopez denied that the officer asked her for the cell phone multiple times. She testified that she gave the officer Muniee's cell phone "right away."

¶ 28    Lopez initially testified that she sometimes lent her truck to defendant, but did not lend it to him for work. She then testified that she sometimes lent the truck to defendant so he could make deliveries.

¶ 29    On redirect examination, Lopez testified that when defendant came home, he said, "[L]ook, [Muniee] left this in the car; I didn't notice; please, when she arrives, give it to her; she's coming here and then, here, you can give it to her." She also testified that defendant told her to give the cell phone to the police.

¶ 30    In closing argument, the State maintained that defendant made no attempt to return Muniee's phone and that, had the police not arrived at defendant's house, the phone would not have been returned at all. Defendant contended that, regardless of how Muniee's cell phone ended up in his possession, his intent was not to permanently deprive Muniee of the use of her cell phone. There was no evidence he threw the phone away or damaged it, which would have permanently deprived Muniee of the phone. Rather, defendant argued, he gave the phone to his sister with

instructions to return it to Muniee, and also instructed his sister to give the phone to the police when she called him to tell him police were at the house.

¶ 31    The court found defendant guilty of theft. In announcing its ruling, the court reasoned that "[t]he [theft] statute requires intent. It doesn't require that the defendant be successful at permanently depriving the complaining witness of property." The court concluded that "[t]he only reason that the complaining witness got her phone back was because the police went and demanded the phone." The court explained it did not find defendant credible "at all," and that it did not find Lopez credible either, pointing out inconsistencies in their testimony.

¶ 32    Defendant filed a motion for a new trial, arguing, *inter alia*, that the State failed to prove his intent to permanently deprive Muniee of her cell phone. The trial court denied defendant's motion for a new trial, stating it still found Muniee credible and defendant incredible, and noting the difficulty Gomez had in obtaining the cell phone from defendant's sister. The court sentenced defendant to six months of supervision, three days of SWAP, fines and court costs, monthly reporting to Social Services, and compliance with the order of protection. Defendant did not file a motion to reconsider sentence.

¶ 33    Defendant timely appealed.

¶ 34    On appeal, defendant only challenges his conviction for theft. Specifically, he maintains the State failed to prove beyond a reasonable doubt that he had the requisite intent to permanently deprive Muniee of her cell phone.

¶ 35    When a defendant challenges the sufficiency of the evidence supporting his conviction, the issue is "whether, viewing the evidence in the light most favorable to the State, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis

in original and internal quotation marks omitted.) *People v. King*, 2020 IL 123926, ¶ 52 (quoting *People v. Collins*, 106 Ill. 2d 237, 261 (1985)). The trier of fact determines the credibility of witnesses, the weight to be given to their testimony, and the inferences to be drawn from the evidence. *People v. Wright*, 2017 IL 119561, ¶ 70. We do not reweigh the evidence, and we do not retry defendant. *People v. Irvine*, 379 Ill. App. 3d 116, 122 (2008); *People v. Houston*, 363 Ill. App. 3d 567, 573 (2006). We will reverse a conviction only where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt. *Wright*, 2017 IL 119561, ¶ 70.

¶ 36    To prove defendant guilty of theft as charged, the State had to establish beyond a reasonable doubt that defendant knowingly exerted unauthorized control over the property of the owner (here, Muniee's cell phone), and intended to deprive the owner permanently of the use of the property. 720 ILCS 5/16-1(a)(1)(A) (West 2016).

¶ 37    Defendant does not challenge the evidence showing he exerted unauthorized control over Muniee's cell phone. He only challenges the evidence supporting his intent to permanently deprive Muniee of the use of her cell phone. As to this element, defendant argues that the cell phone was not damaged in any way, he instructed his sister to return it, and it was returned to Muniee within a matter of hours.

¶ 38    Under the Criminal Code of 2012, "permanently deprive" means to:

"(a) Defeat all recovery of the property by the owner; or

(b) Deprive the owner permanently of the beneficial use of the property; or

(c) Retain the property with the intent to restore it to the owner only if the owner

purchases or leases it back, or pays a reward or other compensation for its return;

or

(d) Sell, give, pledge, or otherwise transfer any interest in the property or subject it

to the claim of a person other than the owner." 720 ILCS 5/15-3 (West 2016).

¶ 39    "The knowledge and intent necessary for a theft charge need not be proven by direct evidence and may, instead, be proven indirectly by inference or by deduction made by the trier of fact based upon the facts and circumstances of the case." *People v. Cameron*, 2012 IL App (3d) 110020, ¶ 32. "Evidence of intent to permanently deprive the owner of property may be inferred from the facts and circumstances surrounding the theft, including the act of theft itself." *People v. Kotero*, 2012 IL App (1st) 100951, ¶ 31 (citing *People v. Adams*, 161 Ill. 2d 333, 343-44 (1994) ("intent to deprive an owner of [her] property may be inferred simply from the act of taking another's property")); see also *People v. Haissig*, 2012 IL App (2d) 110726, ¶ 31 (" 'intent to permanently deprive the owner of [her] property may ordinarily be inferred when a person takes the property of another' " (quoting *People v. Veasey*, 251 Ill. App. 3d 589, 592 (1993))). "Intent may also be inferred from the lack of evidence of intent to return the property or to leave it in a place where the owner could recover it." *Kotero*, 2012 IL App (1st) 100951, ¶ 31 (citing *Adams*, 161 Ill. 2d at 343-44).

¶ 40    The State established beyond a reasonable doubt defendant's act of theft where the evidence showed he forcefully grabbed Muniee's cell phone out of her hand, pushed her away, returned to his vehicle, and fled the scene with her cell phone. Based on defendant's exerting unauthorized control over the cell phone and then driving off with it, the trial court could properly

infer defendant's intent to permanently deprive Muniee of her cell phone. See *Kotero*, 2012 IL App (1st) 100951, ¶ 31; *Haissig*, 2012 IL App (2d) 110726, ¶ 31 (depending on the facts of the case, the control established under section 5/16-1(a)(1) may be all the proof needed to prove defendant's intent to deprive the owner permanently of the use or benefit of her property).

¶ 41    Further, a rational trier of fact could have concluded that "the lack of evidence of intent to return the property" (*Kotero*, 2012 IL App (1st) 100951, ¶ 31) supported defendant's intent to permanently deprive Muniee of her cell phone. After fleeing the scene, defendant did not go back to the location on St. Louis Avenue where he had just seen Muniee in order to return her cell phone to her. He did not contact Muniee to arrange the return of her cell phone, and he did not take the cell phone to her house, even though he knew where she lived. He did not even tell Muniee that her phone was at his house. A rational trier of fact could have concluded that, because defendant made no effort to return the cell phone, he had no intention of ever giving it back to Muniee.

¶ 42    Moreover, the evidence established that defendant took the cell phone to a place where Muniee could not realistically recover it herself. See *Id.* Defendant took Muniee's cell phone into his sister's house on West Deming Place, where he also lived. Given that Muniee had already obtained an order of protection against defendant, a rational trier of fact could have concluded that she would not have felt safe entering his house to recover her cell phone, even if she had been told it was there. In fact, Muniee had to summon police assistance to recover her cell phone from defendant's house, and it was only returned when Officer Gomez went to defendant's house and repeatedly asked his sister for it. Defendant did not give the phone to Gomez and did not even speak to him on June 12, 2017. The trier of fact could have reasonably concluded that defendant concealed Muniee's cell phone in his own house because he intended to keep it permanently, and

that the cell phone was only returned by Lopez because Gomez, a police officer, demanded it. The State's evidence, therefore, established defendant's intent to permanently deprive Muniee of her cell phone beyond a reasonable doubt, and supported his conviction for theft.

¶ 43    Defendant argues the State failed to establish his intent to permanently deprive Muniee of her cell phone because (1) he did not destroy or damage the cell phone; (2)  he gave the cell phone to Lopez with instructions to return it to Muniee; and (3) Muniee's cell phone was returned to her "within hours."

¶ 44    First, the fact that defendant did not destroy or damage the cell phone does not require reversal of his conviction. The State did not have to prove that defendant destroyed or damaged the phone in order to prove his intent to permanently deprive Muniee of its use. See 720 ILCS 5/16-1(a)(1)(A) (West 2016); 720 ILCS 5/15-3 (West 2016). Rather, as explained above, the State was entitled to prove defendant's intent by any of the "facts and circumstances surrounding the theft, including the act of theft itself" (*Kotero*, 2012 IL App (1st) 100951, ¶ 31), and that is what the State did. The physical condition of Muniee's cell phone was not an issue in this case, and it is not a basis for reversing defendant's conviction.

¶ 45    Second, defendant essentially asks us to accept his claim that he instructed Lopez to return the cell phone to Muniee as negating the State's evidence of intent. However, the only evidence that defendant instructed Lopez to return Muniee's cell phone was the testimony of defendant and Lopez, both of whom the trial court found not credible. Upon review, we do not substitute our judgment for that of the trial court with respect to matters of credibility. *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009). The trial court was free to accept as much or as little of defendant's and Lopez's testimony as it chose (*People v. McCarter*, 2011 IL App (1st) 092864, ¶ 22), so it was

free to reject their claims that defendant told Lopez to give the cell phone to Muniee. We cannot reverse defendant's conviction based on the testimony of witnesses the trial court explicitly found to be not credible. See *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009)

¶ 46    Third, defendant essentially argues that, because Muniee's cell phone was returned approximately three hours after defendant stole it, he must have intended to return Muniee's cell phone to her. To reach the conclusion defendant advances, we would have to draw inferences in his favor and accept the most innocent explanation possible, which is contrary to the law. See *Collins*, 106 Ill. 2d at 261; see also *People v. Wheeler*, 226 Ill. 2d 92, 117 (2007).

¶ 47    Further, the fact that Muniee was only deprived of her cell phone for approximately three hours does not require reversal of defendant's conviction, and a rational trier of fact could reasonably determine the only reason she got her phone back was because a police officer retrieved it, not because defendant intended to return it. The State's evidence established that defendant played no role in returning the phone; rather, his sister gave the phone to Gomez only after repeated requests for it. Per his own testimony, defendant was not even home when the return of the cell phone occurred, and Gomez's testimony contradicts Lopez's claim that she phoned defendant and he told her to return Muniee's phone. Thus, the fact that Muniee's cell phone was returned by defendant's sister within hours does not establish defendant's lack of intent.

¶ 48    Finally, defendant argues the trial court should not have inferred his intent from the act of taking the cell phone because he and Muniee were not strangers to each other, and cites *Veasey*, 251 Ill. App. 3d 589, in support of that argument. However, *Veasey* does not require that the defendant and the victim be strangers for a factfinder to infer intent to permanently deprive from the act of theft; it simply mentions that as a type of situation that supports the inference based on

common experience. *Veasey*, 251 Ill. App. 3d at 592 ("It would be contrary to experience and reason to conclude a stranger would * * * take money from another stranger without fully intending to permanently deprive the wronged party of the money." (Internal quotation marks and citation omitted)). Experience and reason also support the conclusion that, when defendant grabbed his estranged wife's cell phone and fled the scene so she could not call the police, he did not intend to return the phone. It would be rational to conclude that defendant took Muniee's cell phone because he did not want the police to be summoned, and thus that he would not have given Muniee the means to summon the police by returning her cell phone. Defendant and Muniee's estranged relationship supports the State's proof of defendant's intent to permanently deprive Muniee of her cell phone, and thus his conviction for theft.

¶ 49    For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 50    Affirmed.