2022 IL App (1st) 192586-U

No. 1-19-2586

Order filed June 9, 2022

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| | ) | |
| v. | ) | No. 17-MC-3000841 |
| | ) | |
| | ) | Honorable |
| RANDOLPH HOPP, | ) | James N. Karahalios and |
| | ) | Joel L. Greenblatt, |
| Defendant-Appellant. | ) | Judges, presiding. |

PRESIDING JUSTICE REYES delivered the judgment of the court.
Justices Lampkin and Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's conviction for theft is affirmed where the evidence was sufficient to
establish that he stole election signs.

¶ 2    Following a jury trial, defendant Randolph Hopp was found guilty of one count of theft

and sentenced to 12 months of conditional discharge, 10 days of community service, and no contact

with the complaining witness, Richard Dunne. On appeal, defendant argues that the State failed to

demonstrate that he had the requisite mental state for theft and, therefore, he was not proven guilty beyond a reasonable doubt. We affirm.

¶ 3    Defendant was charged by misdemeanor complaint with one count of theft predicated on knowingly exerting unauthorized control over property belonging to Dunne, which was not valued more than $500, intending to deprive Dunne permanently of the use of his property (720 ILCS 5/16-1(a)(1)(A) (West 2016)), arising from an incident on April 5, 2017.

¶ 4    At trial, Dunne testified that he had placed two signs for his reelection for Elgin councilman near Chicago Street and Shales Parkway in Elgin sometime prior to the election on April 4, 2017.[1] Dunne had permission from the owners of the property in question to place his signs at the location, conditioned on the signs being removed within 72 hours after the election. Dunne would clean and store the signs for reuse after the election. Only Dunne, his wife, and an individual named Martin Dwyer were authorized to collect the signs; Dunne never gave such permission to defendant.

¶ 5    On April 5, 2017, the day after an election, Dunne received a call from Dwyer, which led Dunne to call the police. Later that day, he went to the Elgin police station. There, he signed a complaint and collected 15 signs measuring four-by-four feet and 20 lawn signs from his reelection campaign; he left 2 four-by-four signs with the police as evidence.

¶ 6    Dunne identified People's Exhibit No. 9 as a photo of his reelection signs. People's Exhibit No. 9, which is included in the record on appeal, depicts three four-by-four signs and two smaller signs leaning against a red van parked in the driveway of a house. On cross-examination, Dunne was unable to identify which signs in the photo were from Chicago and Shales.

---

[1] The Honorable James N. Karahalios presided at defendant's jury trial.

¶ 7    Dwyer testified that he volunteered on the Dunne campaign and had posted two signs at Chicago and Shales. The signs were placed by inserting rebar in the ground and using a twist-tie which requires wire cutters to remove.

¶ 8    On April 5, 2017, Dwyer was collecting signs for Dunne, including the two that had been posted at Chicago and Shales. When he arrived in the area, he noticed that one sign had already been removed, though the posts remained. Another sign located across the intersection was still up. He collected the posts from the first sign before crossing to the other side of the street. However, when he arrived there, the sign that he had previously seen was missing. Only the posts remained.

¶ 9    Dwyer observed a van that contained signs in the back, with a sign for Dunne atop the other signs. Dwyer approached the driver, whom he identified in court as defendant, and asked "something in the nature of, are you helping Mr. Dunne pick up signs." Dwyer testified that defendant "nodded in the affirmative." Defense counsel objected, and the court sustained the objection. The court advised the jury:

> "[W]hen the witness was testifying that the defendant nodded, I observed him, I would characterize it as shaking his head back and forth as opposed to up and down nodding *** That's a conclusion as to what this gentleman intended or meant to communicate by that movement *** you are not to consider the part which says in the affirmative."

¶ 10    Dwyer then testified that defendant did not respond to his inquiry. Dwyer made a mental note of the van's license plate and called Dunne.

¶ 11    Dwyer identified People's Exhibit Nos. 2 and 9 as photographs of defendant's vehicle and of the different types of Dunne's election signs he saw in the van. The exhibits are included in the

record on appeal and depict a red minivan with foggy windows parked in the driveway of a house and five Dunne campaign signs leaning against the minivan, respectively. That afternoon, the Elgin police contacted Dwyer to view a photo array, but Dwyer could not positively identify defendant from the photos. Dwyer said that seeing defendant in person made it easier to identify him. Dwyer also testified that defendant seemed familiar in the van, and that Dwyer recognized defendant from "Elgin politics."

¶ 12    On cross-examination, Dwyer testified that he never saw defendant remove the signs and place them in his vehicle. As the windows of defendant's vehicle were slightly fogged, as depicted in People's Exhibit No. 2, Dwyer was unable to identify which of the signs in People's Exhibit No. 9 was the one he had noticed in defendant's vehicle when he spoke to defendant. Dwyer believed that at least two signs were in the van, with a Dunne sign on top of the others. Dwyer only spoke with defendant for about 30 seconds at around 9:30 a.m.; he went to the police station around 1:30 p.m. that same afternoon to view the photo array.

¶ 13    Detective David Baumgartner testified that he investigated the theft of Dunne's signs on April 5, 2017. He went to defendant's address and, in the driveway, noticed a vehicle matching the description given by an eyewitness. "Numerous" campaign signs were inside the vehicle. Baumgartner identified People's Exhibit No. 3, which is included in the record on appeal, as depicting the rear hatch window of the vehicle with the signs inside.

¶ 14    Once Baumgartner's lieutenant arrived, they knocked on the door of the house; defendant answered and refused entry. The officers inquired of defendant whether the signs in the van were his, and he answered affirmatively. Baumgartner asked where defendant had obtained the signs, and defendant advised that he had collected the signs from various polling places and was cleaning

up after the election. Defendant then asked who was making the complaint. Baumgartner told defendant that it was Dunne as signs which belonged to him were removed. Defendant did not reply. Baumgartner informed defendant that he would like to retrieve the signs and that there had been an eyewitness when the signs were taken. Baumgartner asked defendant whether he had permission to remove the signs, but defendant did not respond. After Baumgartner advised defendant from where the two Dunne signs were taken, defendant agreed to return "the two signs" that "belonged to Councilman Dunne." Defendant then came outside but refused to give Baumgartner permission to enter the vehicle and retrieve the signs.

¶ 15    After Baumgartner explained to defendant again that he did not have legal permission to remove the signs, defendant was arrested. Defendant's mother gave Baumgartner permission to retrieve the signs from defendant's vehicle. Inside the vehicle, Baumgartner noticed a white five-gallon pail containing wire cutters and a utility knife, identified in People's Exhibit No. 6.

¶ 16    On cross-examination, Baumgartner confirmed that he had met with Dunne and Dwyer prior to confronting defendant and that Dwyer was unable to identify defendant in a photo array. There were about 50 signs in the van, but Baumgartner had only asked defendant about Dunne's signs, which defendant agreed to return. It was only later that defendant refused to open the vehicle and return the signs. Defendant never told Baumgartner that he took the signs from Shales.

¶ 17    Elgin police officer Adam Ross testified that he collected evidence from defendant's home on April 5, 2017. Defendant's backyard held a large number of political signs. The State published several photographs, which are included in the record on appeal, which Ross described as depicting the house and van. According to Ross, People's Exhibit No. 9 showed the five Dunne signs—three large and two smaller ones—which were recovered from the back of the vehicle.

¶ 18      Ross testified that additional Dunne signs were found in the backyard of the residence, and the police recovered around 27 Dunne signs in total from the van and residence. They collected all the signs at the residence and separated the Dunne signs to photograph; Baumgartner instructed Ross to return all but two of the larger signs to Dunne. Ross could not say whether those two signs came from the vehicle or the backyard.

¶ 19      On cross-examination, Ross testified that he had to remove other signs from the van to find the Dunne signs. He estimated that the police recovered 40 or 50 signs from the van. He did not know where any of the signs had come from. Ross identified Defense Exhibit No. 2 as a copy of the evidence receipt he made, which indicated that the two signs in evidence were recovered from the yard.

¶ 20      During closing arguments, defense counsel argued that defendant was cleaning up after the election and had the signs for only a few hours, which was not long enough to determine whether he planned to keep them or return them.

¶ 21      The jury found defendant guilty of theft. Following a sentencing hearing, the court imposed 14 months of conditional discharge, 10 days of Sheriff's Work Alternative Program (SWAP), and no contact with Dunne.

¶ 22      Defendant then filed a *pro se* motion alleging ineffective assistance of counsel. Following a hearing pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), the trial court vacated defendant's conviction and ordered a new trial. The case was reassigned to a different judge who granted the State's motion to reconsider, reinstated defendant's conviction, and modified the sentence to 12 months of conditional discharge, 10 days of community service, and no contact with Dunne.[2]

---

[2] The Honorable Joel L. Greenblatt presided at the hearing on the State's motion to reconsider.

¶ 23    On appeal, defendant does not contest that he removed Dunne's signs, but only argues that insufficient evidence established that he had the requisite mental state for theft.

¶ 24    In considering a challenge to the sufficiency of the evidence, this court examines " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis omitted.) *People v. Davison*, 233 Ill. 2d 30, 43 (2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The trier of fact is responsible for weighing the evidence and credibility of witnesses and resolving any inconsistencies in testimony, and the reviewing court will not substitute its judgment on these issues. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224-25 (2009). A criminal conviction will not be overturned "unless the evidence is so unreasonable, improbable or unsatisfactory that it raises a reasonable doubt of defendant's guilt." *People v. Evans*, 209 Ill. 2d 194, 209 (2004). A court "is not required to search out all possible explanations consistent with innocence or be satisfied beyond a reasonable doubt as to each link in the chain of circumstances." *People v. Wheeler*, 226 Ill. 2d 92, 117 (2007).

¶ 25    As charged, a person commits theft when he or she (1) knowingly obtains or exerts unauthorized control over property of the owner and (2) intends to deprive the owner permanently of the use or benefit of the property. 720 ILCS 5/16-1(a)(1)(A) (West 2016). Unauthorized control is control over property without consent of the owner. *People v. Bullock*, 123 Ill. App. 2d 30, 33 (1970). Intent may be inferred from the facts and circumstances around the alleged theft, including "the deceptive nature of the theft itself." *People v. Kotero*, 2012 IL App (1st) 100951, ¶ 33. "A *bona fide* belief, even though mistakenly held, that one has a right or claim to another's property, can negate an intent to permanently deprive the owner of his property." *People v. Baum*, 219 Ill.

App. 3d 199, 201-02 (1991). The trier of fact determines whether the defendant possesses the requisite intent and may infer intent "from acts committed and circumstances in evidence." *Id.* at 201.

¶ 26    Viewing the facts in a light most favorable to the State, a rational trier of fact could find that defendant committed theft. Dunne stated that only he, his wife, and Dwyer had permission to collect his election signs. When Dwyer arrived at Chicago and Shales to remove Dunne signs, he noticed that one was missing, though a second sign was still in place. When Dwyer went to retrieve that sign it was gone. Dwyer observed defendant in a red van near where the second sign had been located, asked whether he was collecting signs for Dunne, and received no response other than some head movement. In the van, Dwyer observed signs for Dunne stacked atop other signs.

¶ 27    Later that afternoon, defendant told Baumgartner the signs in his van were his, and he had collected them while cleaning up after the election. Defendant agreed to return the two Dunne signs after being informed that he was not authorized to remove them, but he subsequently refused to open the vehicle and return the signs. A utility knife and a pair of wire cutters—such as those needed to remove the signs—were discovered in defendant's vehicle.

¶ 28    Taking these facts as a whole, a rational trier of fact could reasonably infer that defendant knowingly took the signs without authorization and with the intent to permanently deprive Dunne of their use. As noted, defendant only contests whether the State established that he had the requisite mental state to commit theft. Defendant argues that he had a *bona fide* belief that the signs were no longer of use to the campaign, and his willingness to return them indicates he never intended to possess them permanently. Defendant also argues that he never lied about or hid the signs, which were easily visible in the back of his vehicle and backyard. Dunne, however, testified

that he never gave defendant permission to remove the signs. The signs were reusable and required wire cutters in order to be removed from their poles. Officer Baumgartner testified that defendant initially claimed the signs were his but said the officers could collect the signs after the officers advised that someone had seen defendant take them; then, defendant equivocated as to whether he would permit the police to retrieve the signs.

¶ 29    The trier of fact "is not required to search out all possible explanations consistent with innocence." *Wheeler*, 226 Ill. 2d at 117; see also *People v. Cline*, 2022 IL 126383, ¶ 34 ("the trier of fact need not search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt"). Viewing the facts in a light most favorable to the State, a reasonable trier of fact could find that defendant knowingly took Dunne's signs with the intent to deprive him permanently of their use. See *Baum*, 219 Ill. App. 3d at 201.

¶ 30    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 31    Affirmed.